UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| MGG SPV DUCK LP<br><br>Plaintiff,<br><br>v.<br><br>SAMUEL BORGESE,<br><br>Defendant. | **COMPLAINT**<br>**JURY TRIAL DEMANDED**<br><br>Civil Case No. 5:24-cv-1546 (GTS/TWD) |

1. Plaintiff MGG SPV Duck LP ("MGG SPV" or "Plaintiff"), as a member of Gather Holdings Guarantee LLC ("GHG") brings this action against Samuel Borgese ("Borgese"), the former CEO and managing member of GHG and its subsidiary businesses, for Borgese's breaches of duty to MGG SPV.

## NATURE OF THE ACTION

2. This action arises out of Borgese's complete abandonment of the business of certain subsidiaries of GHG located in Oregon, following MGG's financing of more than $14 million in that business, and Borgese's commingling and misallocation of those funds to prop up other non-Oregon businesses under Borgese's control and owned by GHG, but in which MGG SPV held no interests.

3. Through GHG and its parent, Gather Holdings LLC ("Gather Holdings"), Borgese owned and controlled the flagging Shari's chain of restaurants operating in Oregon and elsewhere in the pacific northwest. The business was bolstered largely by the potentially lucrative state-licensed video lottery gaming operations in the restaurants located in Oregon.

4. In desperate need of capital to stabilize its restaurant operations, Gather Holdings and its subsidiaries, entered into various transactions through which MGG SPV and investment vehicles managed by its parent, MGG Investment Group LP ("MGG") provided a $14 million term loan to the Oregon business subsidiary, Shari's Management Corporation ("SMC"), invested in the equity of SMC's parent entity, Shari's Restaurant Group ("SRG"), and purchased membership interests of GHG, solely tracking GHG's Oregon business through SRG and SMC.

5. MGG SPV and MGG's commitments were conditioned and dependent on the maintenance of, and repayment from, the revenues of the Oregon restaurants and their lottery sales.

6. Borgese, through Gather Holdings, held the majority of interests of GHG tracking the Oregon business, and 100% of the GHG interests tracking the non-Oregon business. Borgese was the CEO and solely managed the business of GHG and its affiliates.

7. Unbeknownst to MGG SPV and MGG, Borgese promptly abandoned the Oregon business. Borgese used assets and revenues of the Oregon business to prop up the non-Oregon side of the Shari's business in which MGG SPV held no interests, commingled expenses, and left the Oregon business and MGG's investment to disappear, all in blatant breach of his fiduciary duties to MGG SPV as a member of Gather Holdings.

**PARTIES**

8. MGG SPV is a Delaware limited partnership with a principal place of business in New York, New York. MGG SPV, with its investment affiliates, is an investment subsidiary of MGG Investment Group LP ("MGG").

9. Borgese is the sole beneficial owner of all of the interests in Gather Holdings, the parent company of various holding companies through which Borgese owned and controlled dozens of Sharis Cafe & Pies branded restaurants throughout the pacific northwest, including

GHG. Borgese was, at all relevant times, the CEO of GHG. Borgese is, on information and belief, a resident of South Carolina.

## JURISDICTION

10. This Court has subject matter jurisdiction of this matter pursuant to 28 U.S.C. §1332 because there is complete diversity among the parties and the amount in controversy exceeds $75,000.

11. This Court has specific personal jurisdiction and venue is proper, because the parties agreed in the Operating Agreement of Gather Holdings to resolve any disputes in this Court. Venue is proper in this district pursuant to 28 U.S.C. §1391(b)(3).

## FACTUAL ALLEGATIONS

**I.   Sharis Background and Structure**

12. "Shari's Cafe & Pies," "Shari's Restaurants," or, simply, "Shari's," is the brand name of a chain of popular family-style restaurants throughout the pacific northwest, including the State of Oregon.

13. SMC held a contract with the State of Oregon Lottery Commission ("Oregon Lottery") to maintain and operate video lottery terminals ("VLTs") in all of its Oregon restaurants (the "VLT Contract"), which provided a significant and important source of revenue for the Oregon side of the Shari's Restaurant business.

14. The Oregon Shari's business is therefore referred to as the "Oregon/VLT Business."

15. The Oregon/VLT Business was owned and, until being abandoned, operated under SRG and SMC.

16. SMC is wholly owned by SRG, which in turn was, until April 13, 2023, wholly owned by Sharis CP.

17. Sharis CP is in turn wholly owned by GHG, which is owned by the ultimate parent, Gather Holdings.

18. Borgese, individually or through his beneficial interests, holds all of the interests in Gather Holdings.

19. Through other subsidiaries of GHG, in particular Gather Intermediate Holdco, Inc. ("GIH") and its subsidiaries, Borgese also owned and operated the non-Oregon Shari's restaurant locations, including in California and Washington, (the "Non-Oregon Business").

20. A simplified illustration of the intercorporate structure is as follows:



## II.     MGG Investment

21.     For decades, Sharis was a staple brand of family restaurants in the pacific northwest.

22.     However, prior to the outset of the Covid-19 pandemic, Shari's sales had slumped for several years, and the business was embarking on a significant cost reduction and management improvement plan.

23.     The pandemic further impacted the Shari's business and sales declined dramatically.

24.     Nonetheless, as Sharis emerged from the Covid-19 pandemic, its potential for recovery and sales growth was strong, particularly in Oregon with the inherent value of its VLT business.

25.     Shari's required substantial capital to stabilize its operations, refinance its debt, and fund its recovery.

26.     In 2023, MGG entered into a financing arrangement with Borgese and the Shari's entities to provide needed capital for the Oregon/VLT Business.

27.     MGG specifically focused its financing, security and the equity interests therein, on the Oregon/VLT side of the business.

28.     The Oregon/VLT Business had the strongest path to recovery and was most likely to provide a return to MGG, at least according to the representations that it was operated independently from the Non-Oregon Business.

29.     On April 13, 2023, MGG SPV and MGG, on behalf of its various investment funds, entered into a series of financing and equity transactions with Gather Holdings and its subsidiaries.

30. On April 13, 2023, MGG entered into a financing agreement (the "Financing Agreement") pursuant to which MGG through its affiliates made a $14,000,000 term loan to SMC primarily to refinance existing debt and to bolster SMC's balance sheet with $2,500,000 in cash.

31. On April 13, 2023, pursuant to a stock purchase agreement (the "SPA"), MGG SPV paid $1,500,000 to SRG in consideration of the grant of 15,000 shares, or 100% of the preferred stock comprising 15% of the total equity of SRG.

32. On April 13, 2023, pursuant to a separate agreement, MGG SPV paid $2,500,000 in consideration of 294 units of GHG, tracking 29.4% of the Oregon/VLT Business through SMC, SRG.

33. At the time of the breaches alleged in this Complaint, MGG SPV held the equity unit interests in GHG and has continued to hold those units to date.

34. On April 13, 2023, MGG and Borgese entered into a Non-Recourse Carveout Guaranty Agreement ("Non-Recourse Guaranty") through which Borgese guaranteed payment for all obligations owed to MGG pursuant to the Financing Agreement if one or more precipitating events occured.

35. Specifically, Section 1.2 of the Non-Recourse Guaranty provides in relevant part that Borgese shall be liable to MGG for up to eighteen million dollars ($18,000,000) of obligations under the Financing Agreement and Loan Documents upon the occurrence of certain triggering events, including the filing of a bankruptcy proceeding by, or the admission of the insolvency of, Gather Holdings' business.

**III.   Immediate Decline of the Oregon Business**

36. Within months of the closing of the Financing Agreement and associated transactions, Shari's business showed a dramatic and troubling drop in revenue.

37. The Financing Agreement contained various financial requirements and other obligations of the Shari's entities to avoid default, including regular financial reporting and disclosure of early warning signs of potential default.

38. A consultant, engaged to review the operations of the Oregon Business, determined that the Oregon Business was suffering largely because of a complete abandonment of managerial oversight of the Oregon restaurants and refusal to utilize cash to support the management and maintenance of those restaurants.

39. The consultant, Craig Miller, observed that the neglect of management and oversight had led to inoperable equipment, non-functioning back of house management, unsafe and unsanitary working conditions for Shari's staff, and lack of training and high turnover, among others. In short, Borgese had so neglected the Oregon Business, that it was barely functioning, if at all, from a physical plant, financial, and human resources perspective.

40. Borgese had terminated numerous key management positions at the Oregon restaurants, including the Directors of Operations of the Oregon restaurants, initiated the closure of the Oregon administrative office, and directed the remaining staff to work virtually.

41. Shari's had represented to MGG that it had strong operations and a plan to improve its efficiency following the Covid-19 pandemic.

42. MGG provided substantial capital adequate to stabilize and grow, specifically, the Oregon/VLT Business.

43. Rather than apply the new infusion of capital to shore up operations, it appeared that Borgese took the opportunity to entirely neglect the Oregon/VLT Business, in favor of his Non-Oregon Business.

44. Craig Miller further determined that Borgese was intentionally limiting expenditures of capital on vitally needed maintenance and management of the Oregon/VLT Business, to feed the non-Oregon side of Borgese's holdings.

45. These failures directly harmed customer satisfaction, wasted funds supplied for improving operations, and drove down sales.

46. A specific requirement of MGG's financing was that Borgese remain involved and actively manage the Oregon Business.

47. Nonetheless, immediately following the financing, Borgese ceased acting as CEO.

48. In the following months, Borgese completely abandoned the business, maintaining only nominal, if any, involvement in its operations.

49. By August 2023, Borgese, resident at Shari's headquarters in Dallas, Texas (which had been relocated as part of its improvement plan), moved out of state, purchasing a home, and residing, in South Carolina.

50. None of Shari's operations were in South Carolina and Borgese ceased being involved in the day-to-day operations.

51. In his place, Borgese promoted Leslie Crook, a former IT specialist with no substantive management experience, to the position of CEO.

52. Borgese knew that Crook was completely unprepared and unqualified to run the business. Crook was previously an IT consultant to the company and had no experience running a company with dozens of restaurant locations, huge staff, and operations across an entire region.

53. Borgese left the company in Crook's hands and relocated to South Carolina, without providing any support or guidance.

54. Another significant cause of the restaurants' operational (and financial) failures was Borgese's inexplicable termination of a key management agreement between SMC and Gather Management.

55. Gather Management is a wholly-owned management company of GHG. Pursuant to a management services agreement ("MSA") entered into on April 13, 2023 in conjunction with, and as a condition of, MGG's investment, Gather Management was to provide administration and management of the Oregon/VLT Business.

56. Yet, on May 20, 2024, Borgese sent notice on behalf of Gather Management, that it was terminating the MSA and would not continue to provide management services to SMC.[1]

57. The termination of the MSA left SMC completely without crucial administrative and managerial oversight.

58. Borgese terminated the MSA primarily to harm the Oregon business and pressure MGG to renegotiate its financing arrangement with SMC.

59. Borgese sought to drastically reduce the use of cash to maintain the Oregon business, so that he could prop up the non-Oregon Shari's business, all to the determinant of the Oregon Business in which MGG had invested through its tracking interests in GHG.

**IV.  MGG's Notice of Default and Initial Proxy Exercise**

60. In May 2024, SMC missed the interest payment required under the Financing Agreement and in in breach and default thereof.

61. Around the same time, Borgese submitted SMC's required financial reporting for the first quarter of 2024 to MGG. Those reports claimed that SMC's consolidated EBITDA met the minimum requirements under the Financing Agreement.

---

[1] At the time, Shari's Management LLC, prior to its conversion to SMC.

62. However, the EBITDA reported included substantial add-backs that were expressly excluded from EBITDA under the Financing Agreement.

63. Without the attempted add-backs and adjustments to the reported EBITDA and Liquidity, SMC had failed to meet the Financing Agreement's requirements and was in default.

64. On June 10, 2024, MGG issued a Notice of Default ("Default Notice") to SMC because of, among other events of default, SMC's failure to make the required interest payments and meet the Financing Agreement's EBITDA and liquidity requirements.

65. Simultaneous with its issuance of the Default Notice, MGG also exercised certain proxy rights under the Financing Agreement, including appointing Jeff Marwil ("Marwil") as an independent contractor and interim manager of GHG and its subsidiaries.

66. Following his appointment as sole manager of GHG, Marwil informed MGG that GHG and its subsidiaries lacked sufficient cash to pay debts as they became due, including payroll.

67. On June 18, 2024, MGG made a Collateral Agent Advance to SMC in the amount of $1,530,192.00, to fulfill SMC's working capital requirements and pay its operational expenses.

68. On June 28, 2024, Marwil resigned from his role as Sole Manager of GHG and from his roles as manager and/or director of GHG's subsidiaries.

69. As a result of Marwil's resignations, GHG and its subsidiaries were left without manager(s) and/or the necessary authorized person required to take corporate action.

70. On June 29, 2024, following Marwil's resignation, MGG further exercised its proxy rights to amend the limited liability company agreement to, among other things, provide Gather Holdings with the authority to appoint a successor manager for GHG.

71. Pursuant to this authority, Gather Holdings appointed Borgese as Sole Manager of GHG and its subsidiaries, which appointment Borgese accepted on July 2, 2024.

72. Following his appointment on July 2, 2024 as sole manager of GHG, up until his resignation on October 21, 2024, Borgese acted as the sole manager and director in charge of GHG, SMC, and SRC.

## V. MGG Learns Borgese Was Using the Oregon/VLT Business to Prop Up the Other Business

73. Following the defaults, MGG began demanding more detailed financial information from Borgese regarding GHG and its subsidiaries, pursuant to the Financing Agreement and related agreements.

74. Borgese repeatedly refused or delayed providing information regarding the non-Oregon side of the business, and significantly limited the information he did provide.

75. Despite MGG's demands for financial information for the entire Gather Holdings business, to which MGG was entitled pursuant to its financing agreement and as a member of GHG, including the non-Oregon/VLT Business, Borgese resisted and provided only information for the Oregon/VLT Business under SMC.

76. For example, Borgese, through SMC's new CEO, provided profit and loss statements reporting that the Oregon/VLT Business had nearly $2.5 million in cash on hand.

77. When MGG finally gained access to accounting for the other Shari's businesses, it revealed that the reported cash for SMC omitted the negative cash balance of the Non-Oregon Business that was commingled, but not reported on a consolidated basis, with the SMC financials provided to MGG.

78. This commingling of funds resulted in an approximately $1.61 million dollar overstatement of available cash held by the Oregon/VLT Business in financial statements that had been provided to MGG.

79. Another outside consultant engaged to review the financials, Aprio, reported that Borgese had been regularly paying substantial payroll and other expenses of the Non-Oregon Business from a single Wells Fargo Account commingled with SMC and SMC's cash receipts.

80. Borgese had been drawing on the commingled account to pay expenses of the Non-Oregon Business, and partially recording those debits as credits on the Oregon/VLT side's profit and loss statements, but without any actual transfer of cash to balance that account.

81. Until it finally obtained access to more complete financials, MGG was unaware that SMC's available cash was actually approximately $1.6 million less than what was reported to MGG.

82. The Aprio report revealed additional major financial mismanagement and commingling between the Oregon/VLT and Non-Oregon Business.

83. According to Aprio, despite Borgese's purported oversight, no systems were used to properly post sales receipts and expenses to the appropriate Oregon/VLT and non-Oregon restaurants.

84. In addition to the discrepancy in reported cash assets, other expenses including online delivery transaction fees and payroll expenses were misallocated between the Oregon/VLT and Non-Oregon Business.

85. It is estimated that more than $3.3 million in expenses of the Non-Oregon Business were drawn on the commingled Oregon/VLT accounts.

86. On September 11, 2024, Borgese, through his CFO, Daniel Smith, provided MGG with financials for the Oregon/VLT Business for the period ending August 7, 2024.

87. Those financials indicated purported "intercompany" loans from SMC to the Non-Oregon Businesses, totaling $3,359,278.

88. On information and belief, the purported intercompany loans were created after the fact to account for millions of dollars of Oregon/VLT financing and assets used to support the Non-Oregon Business without any recourse.

89. On information and belief, there is no security for the loans and Borgese allowed millions of dollars in Oregon/VLT funds to be used for the benefit of the Non-Oregon Business, without any expectation they would be repaid.

90. On information and belief, Borgese regularly used revenues from the Oregon/VLT Business to support the Non-Oregon Business, leaving the Oregon/VLT Business insolvent and unable to operate.

91. Borgese knowingly cannibalized the Oregon/VLT Business to support the Non-Oregon Business.

92. Borgese knew that because MGG SPV's membership interests in GHG only tracked the Oregon/VLT Business through SRG and SMC subsidiaries, that MGG SPV would be uniquely harmed by his siphoning off of funds from the Oregon/VLT Business.

**VI.  Shutdown and Abandonment of the Oregon/VLT Business**

93. As a tracking unit holder of GHG, MGG SPV had interests solely in the Oregon/VLT Business.

94. Nonetheless, Borgese used MGG's investment in SMC to prop up the failing Non-Oregon Business with complete disregard for the specialized interests of SMC's and GHG's investors in the Oregon/VLT Business.

95. Borgese's abandonment of the business and termination of the MSA left the Oregon restaurants in disarray, leading to failure of equipment, loss of staff, increased turnover, and other operational failures.

96. Borgese's neglect in favor of his interests in the Non-Oregon Business left SMC and SRG with substantial misallocated payroll liabilities and other expenses, deprived SMC of receipts and revenue from Oregon restaurants, and decimated MGG SPV's tracking interests in GHG.

97. On or about September 12, 2024, Borgese informed MGG that he intended to conduct an assignment for the benefit of creditors ("ABC Transaction") of Shari's Non-Oregon Business assets held by GIH.

98. On September 17, 2024, MGG objected in writing to the proposed ABC Transaction, on the basis that Borgese had failed to provide MGG with information concerning the assets to be assigned and their potential sale to an entity affiliated with Borgese, despite multiple requests by MGG.

99. MGG further objected to the proposed ABC Transaction on the basis that Borgese was conducting it to avoid payment of a more than three-million-dollar intercompany loan owed by the Non-Oregon Business to SMC and to put the assets of the Non-Oregon Business out of reach of SMC and its creditors and shareholders.

100. Borgese also lacked the authority to assign GIH's assets through the proposed ABC Transaction without MGG's consent, which was required pursuant to the operative limited liability company agreement of GHG, and completing the ABC Transaction without MGG's consent would constitute an *ultra vires* act.

101. On September 20, 2024, Borgese provided MGG with a purported "Business Update" which included limited details of the proposed ABC Transaction and failed to address the assumption and repayment of the intercompany loan or detail Borgese's potential involvement in acquiring the assets of GIH.

102. The "Business Update" provided information concerning the Oregon/VLT Business's current financial status and stated that "fresh capital" was required to bring landlord and critical vendor payments current, fund minimal repair and maintenance programs, fund brand relaunch marketing, and fund restaurant management and non-management annual performance bonuses.

103. MGG had previously invested and loaned millions of dollars specifically to capitalize SMC.

104. Borgese's claimed need for yet additional capital was directly attributable to his neglect of the Oregon/VLT Business and use of those funds to prop up the Non-Oregon Business.

105. Borgese's "Business Update" further recommended that the Oregon/VLT Business either (a) fund a Chapter 11 bankruptcy filing to restructure the company; or (b) assign the assets for the benefit of the creditors through an ABC structured process.

106. On September 26, 2024, MGG informed Borgese of its continued objections to the proposed ABC Transaction considering Borgese's failure to provide MGG with sufficient information to allow it to properly evaluate the proposed ABC Transaction.

107. On September 27, 2024, Borgese's counsel wrote to MGG to again request its consent to the ABC Transaction, and further stated, with respect to the Oregon/VLT Business's financial condition:

> "the Oregon business is basically at a point where it is simply no longer viable. It is unlikely that the Company's payroll obligations will be met beyond the next payroll period and no officer or equityholder is going to subject themselves to potential personal liability, nor should they be asked or expected to do so. The precipitous decline in revenue at the Oregon locations, coupled with the rent delinquencies and multiple successful foreclosure actions by landlords, among the many other difficulties they are facing, most likely will lead to the closure of all locations in the near future."

108. Pursuant to the VLT Contract, SMC collected receipts from VLT sales, and was required to deposit those receipts into a designated EFT account from which the Oregon Lottery took a weekly draw, based on the amount of VLT sales and any commissions due to SMC.

109. MGG has learned that Borgese failed to adequately maintain and/or segregate receipts from lottery sales sufficient to fund the obligations to the Oregon Lottery.

110. By October 8, 2024, SMC was at least $200,000 in arrears, and Borgese entered into a payment plan with the Oregon Lottery on behalf of SMC.

111. On October 15, 2024, Borgese informed the Oregon Lottery that SMC would be unable to fund the required draw due on October 16, 2024, pursuant to the payment plan that Borgese had agreed to only days earlier.

112. In response, the Oregon Lottery informed Borgese that it would not change the repayment plan Borgese had signed on October 8, 2024. It further informed Borgese that if the required payment was not timely made, a bond would need to be posted or the lottery equipment would be disabled.

113. The Oregon Lottery further informed Borgese that if payment was not made and a bond was not posted within five business days of the due date, then the Oregon Lottery would terminate SMC's VLT Contract for all locations.

114. Upon information and belief, SMC failed to pay the required amount within five business days of its due date.

115. On October 17, 2024, Borgese, through his role as Sole Manager of GHG, provided notice to MGG that the Non-Oregon Business ABC Transaction had been completed, through which Lena Holdings, LLC purchased the assets of GIH.

116. The notice further informed MGG that Borgese owned and controlled Lena Holdings, LLC.

117. On October 21, 2024, Borgese purported to resign from his role as Sole Manager of GHG, leaving GHG and all of its subsidiaries including SRG and SMC without any management. In fact, Borgese had abandoned his oversight of the Oregon Business earlier.

118. Borgese indicated that Gather Holdings had not yet appointed a new manager of the businesses. To date, there appears to be no management of GHG and its subsidiaries.

119. Following Borgese's resignation, the Oregon Lottery terminated the VLT Contract with SMC. The Oregon Lottery cited in its termination that SMC had breached various provisions of the VLT Contract, and had failed to fulfill various financial obligations, including that Borgese had allowed multiple EFT payments to be rejected for insufficient funds.

120. On November 12, 2024, the Oregon Lottery informed SMC that its total outstanding liability for the VLT sales was $905,164.67.

121. In connection with his resignation, Borgese informed MGG that all Oregon Shari's locations had been closed.

122. Borgese understood that a bankruptcy could preserve assets of the Shari's Oregon/VLT Business and was in the best interests of SRG and SMC.

123. However, on several occasions, including in an October 7, 2024 demand from Borgese's attorney, Borgese stated that he would arrange for a Chapter 7 bankruptcy filing for the Oregon/VLT business, only "in exchange for [MGG's] waiver of enforcement of the non-recourse guarantee against him for conducting such filing."

124. Borgese repeatedly refused to protect the Oregon/VLT assets through a bankruptcy proceeding unless MGG provide a release of Borgese from his personal liability under the Non-Recourse Guarantee.

125. MGG offered to revise the Non-Recourse Guarantee to permit a bankruptcy filing without triggering Borgese's guarantee.

126. Borgese insisted on a complete release of all liability from MGG.

127. When MGG declined to provide a complete release to Borgese, Borgese refused to take proper steps to effectuate a bankruptcy or otherwise protect the Oregon/VLT Business assets.

128. Borgese therefore avoided bankruptcy protections and a liquidation of the Oregon/VLT Business in an attempt to avoid his personal liability, contrary to the interests of SRG and SMC's Oregon/VLT Business and their shareholders, and MGG's interests as a holder of GHG unit interests tracking the Oregon VLT/Business.

129. Borgese shuttered the Oregon/VLT Business, resigned from his position, and left SMC without any management.

130. On information and belief, any remaining assets, including equipment, of SMC have been abandoned and are being repossessed by landlords of the Oregon restaurants or lost.

## COUNT I - BREACH OF FIDUCIARY DUTY

131. Plaintiff incorporates by reference the allegations set forth above.

132. Borgese, as majority member and CEO of GHG owed fiduciary duties of care and loyalty.

133. Borgese violated his fiduciary duties of care and loyalty owed to the company and to MGG SPV directly as its managing member, by favoring his own interests in the non-Oregon line of business at the expense of the Oregon/VLT Business.

134. As a result of the foregoing wrongful conduct, Borgese caused the collapse of the Oregon/VLT Business operated through SMC and SRG and allowed millions of dollars to be siphoned off from the Oregon/VLT Business.

135. Because MGG SPV's equity interest in GHG solely tracks the Oregon/VLT Business, MGG SPV has been directly and uniquely damaged in a way that is not shared by the members of GHG generally – specifically Gather Holdings, owned entirely by Borgese.

## JURY DEMAND

Plaintiff hereby demands a trial by jury on all claims so triable.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment as follows:

(a) Declaring that Borgese breached his fiduciary duties;

(b) Entering judgment against Borgese and awarding appropriate relief and damages;

(c) Awarding Plaintiff the costs and disbursements of this action, together with reasonable attorneys' fees and the reimbursement of expenses; and

(d) Granting such other and further legal and equitable relief as the Court may deem just and proper.

Respectfully submitted,

**GARDNER & ROSENBERG P.C.**

/s/Nicholas J. Rosenberg
Nicholas J. Rosenberg
Bar Roll No. 701440
One State Street, Fourth Floor
Boston, MA 02109
Tel: 617-390-7570
nick@gardnerrosenberg.com

*Attorneys for Plaintiff MGG SPV Duck LLP*

Dated: